1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN BARRIENTOS, JR., | Case No. 1:23-cv-01432-JLT-SAB |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DENYING DEFENDANT'S MOTION TO CERTIFY EMPLOYMENT UNDER THE FEDERAL TORT CLAIMS ACT |
| v. | |
| DALE ALLAN WALKER, | |
| Defendant. | (ECF Nos. 12, 15, 16, 17) |
| | **OBJECTIONS DUE WITHIN FOURTEEN DAYS** |

## I.

## INTRODUCTION

Currently before the Court is Defendant Dale Allen Walker's ("Defendant") motion to certify he was acting within the course and scope of his employment with the Tule River Indian Tribe ("Tribe") while carrying out a self-determination contract pursuant to the Indian Self-Determination and Education Assistance Act ("ISDEAA") at the time of the motor vehicle collision that forms the basis of the complaint. Because the United States has refused to certify Defendant's employment, Defendant petitions the Court under 28 U.S.C. § 2679(d)(3) to find and certify he is a covered employee under the Federal Tort Claims Act ("FTCA"), substitute the United States as the party defendant, and dismiss Defendant from this action. Based on the moving, opposition, and reply papers and the information presented by counsel at the hearing held in this matter, the Court recommends Defendant's motion be DENIED, and the case be remanded to the Tulare County Superior Court pursuant to 28 U.S.C. § 2679(d)(3).

## II.

## BACKGROUND

### A.     The Memorandum of Agreement

The Tribe is a federally recognized Indian tribe.  (Def.'s Mot. to Certify Emp't. ("Mot.") ECF No. 12 at 7 (citing ECF No. 12-2 at 2, 9).)[1]  In or around 2014, the Tribe requested that the Indian Health Service ("IHS") conduct a preliminary engineering evaluation to install a sewer extension to service thirty-four homes with failing or soon-to-fail sewer lines.  (United States' Opp'n to Def's Mot. ("USA Opp'n") ECF No. 16 at 6; Declaration of Jonathan Rash ("Rash Decl.") ECF No. 16-1, Ex. 3 at 4.)  IHS conducted the evaluation and issued a report in June 2014 wherein IHS recommended, among other options, a sewer extension that would connect the thirty-four homes to the community's main sewer line.  (Id.)

In June 2017, the Tribe requested IHS assistance under the provisions of P.L. 86-121[2] to construct the sewer extension.  (Rash Decl., Ex. 2 at 3.)  A June 2017 project summary authored by IHS recommended that IHS assist the Tribe in construction of the Tule River North Reservation Sewer Extension Project ("Project").  (Id.)  The project summary detailed that IHS would be responsible for environmental review and technical assistance, the Tribe would contribute construction labor through its Tribal Force Account, and the Project would be funded through a Clean Water Act Indian Set-Aside ("CWISA") contribution from the Environmental Protection Agency ("EPA").  (Id. at 3, 5.)

In a letter dated July 6, 2017, the regional CWISA coordinator notified the Tribe that the Project was selected for funding under the CWISA program. (Declaration of Loretta Vanegas ("Vanegas Decl.") ECF No. 16-5, Ex. 1 at 2.)  The EPA informed the Tribe that it planned to award the funds through an interagency agreement ("IA") with the IHS, meaning the EPA would enter the agreement with and provide the funds to IHS, rather than the Tribe.  (Id.)  The EPA

---

[1] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

[2] The Indian Sanitation Facilities Act "authorizes" the IHS "to construct, improve, extend, or otherwise provide and maintain ... domestic and community water supplies and facilities ... for Indian homes, communities, and lands." Pub. L. No. 86-121, 73 Stat. 267 (codified at 42 U.S.C. § 2004a(a)(1) (1976)).  IHS carries out its authority through its Sanitation Facilities Construction Program.  Division of Sanitation Facilities Construction, INDIAN HEALTH SERV., https://www.ihs.gov/dsfc/ (last visited Feb. 26, 2024).

1   informed the Tribe that, "[b]y accepting the funds via an interagency agreement, the Tribe and

2   IHS will work cooperatively to complete this project. IHS will assist with the administrative

3   management of the project….The Tribe will work with IHS throughout the entire process and

4   provide input on how the project will be completed…."  (Id.)  The notification stated that if the

5   interagency agreement was not acceptable, the Tribe "may choose to reject the award or submit a

6   request for a justification for a direct grant."  (Id.)  Under a direct grant, funding would be

7   provided by the EPA directly to the Tribe and the Tribe would be responsible, among other

8   requirements, for "completion of an environmental review of the project, submission of

9   documentation prior to construction, and would need to provide detailed information on its

10  technical, administrative, and legal capacity to complete a construction project."  (Id. at 3.)

11      The notification also directed the Tribe to the CWISA website for more information.

12  (Id.)  The website includes a link to "Frequently Asked Questions (FAQ) about the U.S. EPA

13  Clean Water Indian Set-Aside Program for Potential Applicants," which provides further

14  information regarding interagency agreements and direct grants, including that:

> Tribes that have assumed the responsibility to implement the IHS
> Sanitation Facilities Construction Program under the Indian Self-
> Determination Act (P.L. 93-638) can only receive CWISA funds
> through a direct grant with the EPA. Tribes that have requested to
> have IHS administer and manage a project on their behalf require
> an IA between EPA and IHS. Funds provided by EPA through an
> IA to IHS may only be used in agreements authorized by the
> Indian Sanitation Facilities Act, 42 U.S.C. 2004a (P.L. 86-121).

(Declaration of Joseph Frueh ("Frueh Decl.") ECF 16-12, Ex. 1 at 4.)

    The EPA's notification required that the Tribe provide its written decision accepting or

rejecting the award through the IA.  (Id.)  On July 21, 2017, the Tribe notified the EPA that "the

Tribal Council has voted, by resolution number 2017-0157, to accept this funding and condition

set forth through the Interagency Agreement."  (Vanegas Decl., Ex. 2 at 2.)

    In September 2017, the EPA and IHS executed the IA.  (Vanegas Decl., Ex. 3.)  The IA's

terms and conditions provided that the "[f]unds transferred by EPA to the IHS under this IA may

only be used in agreements authorized by Indian Sanitation Facilities Act, 42 U.S.C. 2004a."

(Id. at 5.)  The IA also provided that "[t]he IHS shall implement and execute projects funded

1    under this IA using its administrative policies and procedures as described in the Indian Health

2    Manual, Part 5, Chapter 2, Memorandum Agreement."  (Id. at 7.)

3         In June 2018, the Tribe and IHS executed a Memorandum of Agreement ("MOA") for

4    the Project "under and pursuant to the provisions of Public Law 86-121."  (Declaration of Gary

5    Whitten ("2023 Whitten Decl.") ECF No. 12-3, Ex. J at 6.)[3]  The MOA details that the IHS will

6    provide to the Tribe "engineering services and technical assistance with contract administration,

7    construction inspection, supply and materials purchase, construction staking…[t]he instructions

8    as to the proper utilization, maintenance, operation, and protection of the facilities…," "prepare a

9    work plan, including a project schedule," and that funding is provided through the CWISA

10   contribution for the Project.  (Id. at 11, 14.)  The Tribe agreed to obtain a contractor and

11   contribute labor.  (Id. at 7-8.)  The Tribe and the IHS also agreed that "[t]he Tribe is responsible

12   for all tort claims…resulting from its activities on this project."  (Id. at 10.)  The Tribal Force

13   Account documents prepared by the Tribe detailing its labor contribution to the Project state that

14   the "Tribe must obtain and maintain current insurance policies, including public general public

15   liability and property damage…throughout the project construction."  (Declaration of Charmaine

16   A. McDarment ("McDarment Decl.") ECF No. 12-2, Ex. H at 93.)

17        In correspondence dated November 2, 2021, the IHS informed the Tribe that construction

18   on the Project was completed.  (2023 Whitten Decl., Ex. M at 24-25.)

19        **B.    The Subject Motor Vehicle Collision**

20        The instant action arises out of a motor vehicle collision that occurred at approximately

21   4:40 p.m. on September 2, 2020 in Tulare County, when Defendant, the Project's tribal

22   construction supervisor, allegedly failed to yield to a stop sign and collided with Ruben

23   Barrientos, Jr. ("Plaintiff").  (ECF No. 1-1 at 5; Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n") ECF

24   No. 15 at 5.)  At the time of the collision, Defendant was purportedly over 20 miles from the

25   Project site and was driving in the direction of his residence.  (Id.)  However, Defendant, who

---

[3] There are two declarations by the Tribe's Public Works Director, Gary Whitten in this motion. The United States proffers a declaration by Mr. Whitten dated August 8, 2022 ("2022 Whitten Decl.") which Defendant submitted to the United States Attorney's Office prior to removal to federal court.  (Frueh Decl., Ex. 3.)  Defendant proffers a declaration by Mr. Whitten dated November 1, 2023 ("2023 Whitten Decl.") filed in support of Defendant's motion, which includes the MOA as an exhibit.  (ECF No. 12-3, Ex. J.)

1   was operating a vehicle owned by the Tribe at the time of the collision, contends that he was
2   acting in course and scope of his employment with the Tribe at the time of the collision. (Mot.
3   22.) Defendant maintains he was driving to pick up supplies for the Project at an unknown
4   location in Bakersfield at the request of his supervisor. (Id.; 2023 Whitten Decl. ¶ 8.)

5       **C.    Procedural Background**

6       On April 1, 2022, Plaintiff filed this action in the Tulare County Superior Court ("State
7   Court"), Case No. VCU291172, alleging negligence against Defendant and the Tribe. (ECF No.
8   1-1 at 2.) On August 30, 2022, Plaintiff submitted an FTCA claim to the U.S. Attorney's Office,
9   claiming to have suffered damages as a result of the September 2, 2020 collision. (McDarment
10  Decl. ¶ 4.) On September 1, 2022, the Tribe submitted notification of Plaintiff's FTCA claim to
11  the DHHS, the U.S. Attorney General, and the U.S. Attorney's Office pursuant to 28 U.S.C. §
12  2679(c) and 25 C.F.R. 900.188. (Id. at ¶ 5.) On December 1, 2022, pending the United States'
13  determination regarding FTCA certification, the State Court granted a stay of all proceedings
14  until the FTCA claim had been resolved. (Id. at ¶ 7.)

15      On December 21, 2022, the Attorney General denied Defendant's FTCA certification.
16  (Id. at ¶ 8.) On January 9, 2023, the DHHS denied Plaintiff's FTCA claim, noting the Attorney
17  General had determined that the subject collision is not covered by the FTCA. (Id. at ¶ 9.) On
18  March 1, 2023, the Tribe requested reconsideration of the denial of certification. (Id. at ¶ 10.)

19      On June 2, 2023, the State Court granted a stipulation between Plaintiff, the Tribe, and
20  Defendant Walker to dismiss the Tribe with prejudice due to the Tribe's sovereign immunity.
21  (Id. at ¶ 6.) The parties stipulated that the Tribe's insurance policy covers Defendant for the
22  subject collision and any recovery by Plaintiff would be limited to the policies issued to the Tribe
23  or Defendant that are applicable to the subject collision. (Id., Ex. D at 40-44.)

24      On June 5, 2023, the Attorney General denied Defendant's request for reconsideration of
25  FTCA certification. (Id. at ¶ 11.) On September 20, 2023, Defendant filed a motion in the State
26  Court to certify employment under the FTCA, substitute the United States as a defendant, and
27  dismiss Defendant. (ECF No. 1-2.) On October 3, 2023, the United States removed the action to
28  this Court pursuant to 28 U.S.C. § 2679(d)(3). (ECF No. 1.)

1    On November 1, 2023, Defendant re-filed his motion before this Court.  On November 2,

2  2023, the motion was referred to the assigned Magistrate Judge for the preparation of findings

3  and recommendations.  (ECF No. 13.)  On November 15, 2023, the United States and Plaintiff

4  filed separate oppositions to Defendant's motion.  On November 27, 2023, Defendant filed a

5  reply addressing both oppositions.  (Def.'s Reply ("Reply") ECF No. 17.)

6    The Court held a hearing in this matter on December 13, 2023.  (ECF No. 19.)  Racheal

7  White Hawk appeared via video on behalf of Defendant.  Megan Klein appeared via video on

8  behalf of Plaintiff.  Joseph Frueh appeared via video on behalf of the United States.  The Court

9  took the matter under submission.

10                                        **III.**

11                              **LEGAL STANDARD**

12    The Federal Employees Liability Reform and Tort Compensation Act, 28 U.S.C. §

13  2679(d), "immunizes United States employees from liability for their 'negligent or wrongful

14  act[s] or omission[s] ... while acting within the scope of [their] office or employment.' " Green

15  v. Hall, 8 F.3d 695, 698 (9th Cir. 1993) (citing 28 U.S.C. § 2679(b)(1)).  Under the Act, the

16  Attorney General may "certify that a United States employee was acting within the scope of his

17  employment at the time of an incident which gave rise to a civil claim." Meridian Int'l Logistics,

18  Inc. v. United States, 939 F.2d 740, 743 (9th Cir. 1991) (citing 28 U.S.C. §§ 2679(d)(1), (2)).  If

19  the Attorney General[4] refuses to certify that a defendant acted within the scope of his federal

20  employment at the time of the commission of the alleged tort, the defendant may petition the

21  court to certify employment any time before trial.  28 U.S.C. § 2679(d)(3).  If the defendant's

22  petition is filed in a civil action pending in a state court, the action may be removed by the

23  Attorney General to the district court for the district and division embracing the state court in

24  which the action is pending.  Id.

25    Upon removal, the district court reviews the Attorney General's decision to deny

26  employment certification *de novo*, and "the party seeking review bears the burden of presenting

27

28  [4] "The Attorney General, pursuant to his authority under 28 U.S.C. § 510, has delegated this authority to the United States Attorneys." Meridian Int'l Logistics, Inc., 939 F.2d at 743 n.2 (citing 8 C.F.R. § 15.3).

6

evidence and disproving the Attorney General's decision to grant or deny scope of employment certification by a preponderance of the evidence." Green, 8 F.3d at 698. If the district court concludes the employee acted outside the scope of his or her federal employment, the action shall be remanded to the state court. 28 U.S.C. § 2679(d)(3). Alternatively, if the district court determines the employee acted within the scope of his employment, the United States shall be substituted as the party defendant. Id. "The substitution leads, in effect, to 'a single avenue of recovery' against the United States under the Federal Tort Claims Act," and the covered employee is therefore dismissed from the action. Wilson v. Horton's Towing, 906 F.3d 773, 781 (9th Cir. 2018) (citing Green, 8 F.3d at 698).

For purposes of FTCA liability, the "ISDEAA's waiver of federal sovereign immunity is limited to 'self-determination contracts' entered into by Indian tribes or tribal organizations and the government." Demontiney v. U.S. ex rel. Dep't of Interior, Bureau of Indian Affs., 255 F.3d 801, 805 (9th Cir. 2001). The Ninth Circuit has developed a two-step test for determining whether a tribal employee can be deemed a covered employee for purposes of FTCA liability. See Shirk v. U.S. ex rel. Department of Interior, 773 F.3d 999 (9th Cir. 2014); Wilson, 906 F.3d at 781 (applying Shirk's two-step analysis to a FTCA certification challenge). To be considered a federal employee, "tribal employees must act 'within the scope of their employment where the relevant 'employment' is 'carrying out the contract or agreement.' " Id. (citing Shirk, 773 F.3d at 1008 n.6). To make such a determination, a court must first determine whether "the language of the federal contract 'encompass[es] the activity that the plaintiff ascribes to the employee'[.]" Id. (quoting Shirk, 773 F.3d at 1007). Second, a court must determine whether "the employee's activity f[ell] 'within the scope of employment'[.]" Id. (quoting Shirk, 773 F.3d at 1007). A tribal employee will therefore only be deemed a federal employee if, "while executing his contractual obligations under the relevant federal contract, his allegedly tortious conduct falls within the scope of employment as defined by state law." Id. (quoting Shirk, 773 F.3d at 1005).

///

///

///

1

**IV.**

2

**DISCUSSION**

3      Because the United States has refused to certify Defendant's employment under the

4  FTCA, Defendant petitions this Court to find he is a covered federal employee under the

5  ISDEAA because was acting within the course and scope of his employment with the Tribe and

6  executing his contractual obligations under the MOA at the time of the subject collision.  See

7  Shirk, 773 F.3d at 1007.  Thus, as the party seeking review of the United States' denial,

8  Defendant bears the burden of presenting evidence and disproving the United States' decisions to

9  deny employment certification.  However, for FTCA coverage under the ISDEAA to apply and

10 trigger the Shirk analysis, the MOA must be a self-determination contract.  Plaintiff and the

11 United States argue the MOA is not a self-determination contract.  Defendant avers the ISDEAA

12 required that the government enter into a self-determination contract with the Tribe for the

13 Project, and therefore the Court should construe the MOA as a self-determination contract.  For

14 the following reasons, the Court recommends finding that the ISDEAA did not require that the

15 government enter into a self-determination contract with the Tribe and that the fully performed

16 MOA cannot be construed as a self-determination contract under the ISDEAA.

17      **A.      The ISDEAA and Self-Determination Contracts**

18      In 1975, Congress passed the ISDEAA[5] "to increase tribal participation in the

19 management of programs and activities on reservations by authorizing tribes and tribal

20 organizations to enter into contracts, called 'self-determination contracts,' with either the

21 Secretary of Health and Human Services[6] or the Secretary of the Interior."  Sisto v. United

22 States, 8 F.4th 820, 824 (9th Cir. 2021) (citing 25 U.S.C. § 5304(i)-(j)).  A self-determination

23 contract is a contract entered into between a tribal organization and the Secretary "for the

24 planning, conduct, and administration of programs or services" that otherwise would have been

25 provided directly by the federal government.  25 U.S.C.A. § 5304(j).  "The Secretary is directed,

26 upon the request of any Indian tribe by tribal resolution, to enter into a self-determination

27

_____

28
[5] Pub. L. No. 93-638, 88 Stat. 2203 (1975) (codified as amended at 25 U.S.C. § 5301 et seq.).
[6] The Secretary of Health and Human Services will hereinafter be referred to as "Secretary."

1    contract or contracts with a tribal organization to plan, conduct, and administer programs or

2    portions thereof, including construction programs. . .provided by the Secretary of Health and

3    Human Services under the [Transfer] Act of August 5, 1954").  25 U.S.C. § 5321(a)(1)(C)  "In

4    other words, self-determination contracts are mandatory rather than discretionary."  Hoopa

5    Valley Indian Tribe v. Ryan, 415 F.3d 986, 990 (9th Cir. 2005).

6         Acknowledging tribal governments are "performing a federal function" and "a unique

7    legal trust relationship exist[s] between the tribal government and the federal government" when

8    carrying out self-determination contracts, Congress amended the ISDEAA in 1988 to extend

9    FTCA liability to tribal employees acting under a self-determination contract.  FGS Constructors,

10   Inc. v. Carlow, 64 F.3d 1230, 1234 (8th Cir. 1995); Wilson, 906 F.3d at 781.  "In short, Indian

11   tribes, tribal organizations, Indian contractors, and their employees are protected by the FTCA

12   when they are carrying out functions authorized in or under an ISDEAA agreement or contract,

13   and the United States is subject to potential tort liability for the acts or omissions of tribal

14   employees."  Beetus v. United States, 527 F. Supp. 3d 1075, 1078 (D. Alaska 2021).

15        **B.    The Parties' Positions Regarding the MOA's Status Under the ISDEAA**

16        Although Defendant and the United States agree that the Tribe and IHS entered into the

17   MOA in 2018 following the Tribe's request for assistance under the Sanitation Facilities Act to

18   construct the Project, Defendant and the United States disagree whether the MOA constitutes a

19   self-determination contract.[7]  Neither the United States nor Defendant cites any authority—and

20   the Court finds none—that a court has previously been tasked with determining whether a fully

21   performed federal contract between a Tribe and the Secretary should retroactively be deemed a

22   self-determination contract under the ISDEAA.

23        Defendant argues the MOA is a self-determination contract under the ISDEAA because it

24   was entered into following the Tribe's request to construct wastewater disposal facilities on

25   behalf of the government with the Tribe's employees under the Sanitation Facilities Act.

26   Defendant contends the ISDEAA's plain text and legislative history dictates that the Secretary

27   _____

28   [7] In his opposition, Plaintiff joins the United States' opposition and only summarily argues the MOA is not a self-
     determination contract under the ISDEAA.  (See generally Pl.'s Opp'n.)

was required to enter a self-determination contract with the Tribe.  Defendant therefore requests that the Court construe the fully performed MOA as a self-determination contract.  Defendant filed two declarations providing documents supporting the procedural history of the case, the MOA, and the notice of project completion.  (See McDarment Decl.; 2023 Whitten Decl.)

The United States argues the MOA is not a self-determination contract under the ISDEAA because the MOA was merely a legal instrument through which the Tribe participated in IHS's Sanitation Facilities Construction ("SFC") Program.  The United States avers that nothing in the MOA suggests a transfer of authority or control over the SFC Program from IHS to the Tribe, which is the basic feature of a self-determination contract.  The United States also argues that the MOA does not contain mandatory terms of a self-determination contract and was not subjected to the specific process for review and negotiation of proposals required for self-determination construction contracts.  Further, the United States emphasizes that the MOA states that the Tribe is responsible for all tort claims resulting from activities on the Project, which confirms the MOA is not a self-determination contract.  The United States proffers four declarations to support its position that the MOA is not a self-determination contract.  Defendant did not file any objections to the declarations or exhibits attached thereto.

First, Jonathan Rash is the Associate Director of the Office of Environmental Health and Engineering in the California Area Office of the IHS.  (Rash Decl. ¶ 1.)  In that capacity, he "oversee[s] projects that IHS carries out with California Tribes under the [SFC Program]…."  (Id.)  Rash contends "[t]he MOA for the Project is not a self-determination contract under the [ISDEAA]…" (id. at ¶ 5) and "the Hoopa Valley Tribe is the only California Tribe that [he] is aware of that has elected to assume responsibility of the SFC Program under the ISDEAA" (id. at ¶6).  Rash testifies that "IHS executes about 30 to 50 MOAs with California Tribes every year under Public Law No. 86-121, and none occurs under the authority of the ISDEAA."  (Id. at ¶ 7.)  By executing an MOA, Rash contends the Tribes "avoid substantial costs associated with professional-services contracts (project management, planning, environmental compliance, specialty-engineering services, engineering design and construction management) that typically exceed the federal funding available if a Tribe were to manage such projects under the

1    ISDEAA."   (Id.)   Rash proffers the "IHS can perform this work in-house or through its

2    professional-services contracts in a more cost-efficient manner due to the economy of scale

3    achieved by serving many different Tribes and projects every year." (Id.)

4         Second, Loretta Vanegas is "an Environmental Protection Specialist at the [EPA]…."

5    (Vanegas Decl. ¶ 1.)  Vanegas previously served as the regional CWISA Program Coordinator

6    and as the California Area Project Officer under the CWISA Program.  (Id.)  Vanegas contends

7    that she was assigned to work on the 2017 IA between the EPA and IHS to provide CWISA

8    funds to the IHS for the Project. (Id. at ¶ 2.)   In that capacity, she "review[ed] the IHS's

9    California—Sanitation Deficiency System list for the selection of the project based on the higher

10   priority ranking of the project on the list, notif[ied] [IHS] and [the Tribe] of their project

11   selection, ensur[ed] IHS had completed a project summary engineering report, and process[ed]

12   the IA action for an IA award through [CWISA] Program guidance."  (Id.)

13        Third, Wesley Simmons is "the Agency Lead Negotiator for the California Area Office

14   for the [IHS]," and "represent[s] the IHS Director in negotiations under the [ISDEAA]."

15   (Simmons Decl. ¶ 1.)  In that capacity, he has "access to and personal knowledge of the self-

16   determination contracts entered into under the ISDEAA between California Tribes and IHS."

17   (Id.)  Simmons contends there is only one self-determination contract entered into between IHS

18   and the Tribe, but that contract does not include any programs, services, functions, or activities

19   under the SFC Program.  (Id. at ¶ 2.)  Simmons further testifies that the Tribe is a member of a

20   tribal consortium that is involved in another self-determination contract with the IHS, but it

21   similarly does not include any programs, services, functions, or activities under the SFC

22   Program.[8]  (Id. at ¶ 3.)  Simmons contends that he is unaware of any other self-determination

23   contracts entered into between the IHS and the Tribe under the ISDEAA.  (Id. at ¶ 4.)

24        Fourth, counsel for the United States in the instant matter provides a declaration in

25   support of the United States' opposition.  (See generally Frueh Decl., ECF No. 16-2.)  Relevant

---

[8] Both self-determination contracts are attached to Simmons' declaration.  (ECF Nos. 16-10, 16-11).  The Court
notes the purpose of the self-determination contract directly between the IHS and the Tribe is to "provide
Alcoholism/Substance Abuse; Aftercare; and Outreach Services to eligible members of the [Tribe]…" (ECF No. 16-
10 at 6.)   The purpose of the self-determination contract between the IHS and the tribal consortium is for
"comprehensive health services."  (ECF No. 16-11 at 2.)

1  to the United States' argument that the MOA is not a self-determination contract, the declaration

2  provides excerpts of "Frequently Asked Questions (FAQ) about the [CWISA] Program for

3  Potential Applicants" located on EPA's website and excerpts from the IHS's Technical

4  Assistance Guide for Public Law 93-638 Construction. (Frueh Decl., Exs. 1, 5.) The Court takes

5  judicial notice of both documents published on the EPA and IHS websites. See Corrie v.

6  Caterpillar, Inc., 503 F.3d 974, 978 n.2 (9th Cir. 2007) (taking judicial notice of government-

7  published documents); Stoyas v. Toshiba Corp. 896 F.3d 933, 946 n.17 (9th Cir. 2018) (same).

8       In the same declaration, the United States also proffers a 283-page declaration by

9  Victoria May, who was a Self-Determination Officer/Level 1 Awarding Official for the Central

10  California Agency of the Bureau of Indian Affairs, filed in Manuel v. United States, No. 1:14-

11  CV-665-LJO-BAM, 2014 WL 6389572 (E.D. Cal. Nov. 14, 2014). (Frueh Decl., Ex. 2.) The

12  United States contends the declaration—which purports to authenticate multiple self-

13  determination contracts entered into between the BIA and the Tribe—is subject to judicial notice,

14  given it is a court filing and matter of public record. (Id. ¶ 3.) The United States argues that the

15  contents of the 2014 declaration demonstrates that "the Tribe knows how to enter into self-

16  determination contracts under the ISDEAA and has done so many times." (USA Opp'n 13.)

17  The United States thus appears to rely on Ms. May's veracity and her authentication of the

18  hundreds of pages of documents attached to the declaration. Although court filings and other

19  matters of public record are judicially noticeable, the truth of the facts within are not. See M/V

20  Am. Queen v. San Diego Marine Constr. Corp., 708 F.2d 1483, 1491 (9th Cir. 1983) (noting "a

21  court may not take judicial notice of proceedings or records in another cause so as to supply,

22  without formal introduction of evidence, facts essential to support a contention in a cause then

23  before it"). Because Defendant does not dispute judicial notice of the declaration from Manuel,

24  the Court takes judicial notice of the fact that the declaration was filed in the unrelated Manuel

25  case. The Court does not take judicial notice of the declaration for the truth of the facts asserted,

26  including its authentication of the documents attached thereto.

27  / / /

28  / / /

1

2

**C.     The MOA Is Not a Self-Determination Contract Subject to FTCA Liability Under the ISDEAA**

3    Defendant argues the plain text and legislative history of the ISDEAA establishes that the

4   IHS was required to enter into a self-determination contract with the Tribe when the Tribe

5   requested assistance under the Sanitation Facilities Act to construct the Project.   While

6   Defendant does not argue that the Tribe specifically intended to enter into a self-determination

7   contract in June 2017, Defendant avers the MOA should now be construed as a self-

8   determination contract.   For the following reasons, the Court finds Defendant's argument is

9   antithetical to the plain text and purpose of the ISDEAA.

10    "It is well established that when the statute's language is plain, the sole function of the

11   courts—at least where the disposition required by the text is not absurd—is to enforce it

12   according to its terms."  Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (internal quotation

13   marks and citation omitted). "When we look to the plain language of a statute in order to

14   interpret its meaning, we do more than view words or subsections in isolation. We derive

15   meaning from context, and this requires reading the relevant statutory provisions as a whole."  In

16   re Rufenen Constr., Inc., 53 F.3d 1064, 1067 (9th Cir. 1995) (citation omitted).   Courts "must

17   interpret statutes as a whole, giv[e] effect to each word and mak[e] every effort not to interpret a

18   provision in a manner that renders other provisions of the same statute inconsistent, meaningless

19   or superfluous."  Boise Cascade Corp. v. United States E.P.A., 942 F.2d 1427, 1432 (9th Cir.

20   1991).  "Particular phrases must be construed in light of the overall purpose and structure of the

21   whole statutory scheme."  United States v. Lewis, 67 F.3d 225, 228–29 (9th Cir. 1995).

22    Defendant primarily relies on one subsection of the ISDEAA to argue the Secretary was

23   required to enter into a self-determination contract with the Tribe for the Project:

24          The Secretary is directed, upon the request of any Indian tribe by
            tribunal resolution, to enter into a self-determination contract or
25          contracts with a tribal organization to plan, conduct, and
            administer programs or portions thereof, including construction
26          programs…provided by the secretary of Health and Human
            services under the [Sanitation Facilities Act]….

27

28   25 U.S.C. § 5321(a)(1)(C).  Defendant avers that when the Tribe requested to construct the

13

1   Project with the Tribe's employees under the Sanitation Facilities Act, the Tribe requested to

2   plan, conduct, and administer programs or portions thereof under the Sanitation Facilities Act.

3   (Mot. 12-13.)   Therefore, according to Defendant, the plain text of section 5321(a)(1)(C)

4   required the Secretary to enter into a self-determination contract with the Tribe.  (Id. at 13.)

5           The Court finds Defendant's construction of section 5321(a)(1) fails to consider the

6   phrase "upon the request of any Indian tribe by tribal resolution…."  Reading section 5321(a)(1)

7   as a whole and giving effect to each word, "[t]he Secretary is directed, *upon the request of any*

8   *Indian tribe by tribunal resolution*, to enter into a self-determination contract with a tribal

9   organization to plan, conduct, and administer programs or portions thereof…." The statute

10  plainly requires that a tribe request by tribal resolution to enter into a self-determination contract

11  with the Secretary.  Ford v. Moore, 552 N.W.2d 850, 853-54 (S.D. 1996) (finding "[t]his

12  statutory scheme makes it clear a tribal resolution is a prerequisite to any contract made under

13  the ISDEAA").

14          Section 5321(a)(1)(C) thus gives control to the tribes to decide whether or not to enter

15  into a self-determination contract.  See 25 C.F.R. § 900.3(b)(5) ("The Secretary recognizes that

16  tribal decisions to contract or not to contract are equal expressions of self-determination").  As

17  Defendant points out, the purpose in enacting the ISDEAA was to promote tribal input and

18  control over federal programs for the benefit of Native people:

19          The Congress, after careful review of the Federal Government's
             historical and special legal relationship with, and resulting
20          responsibilities to, American Indian people, finds that—(1) the
             prolonged Federal domination of Indian service programs has
21          served to retard rather than enhance the progress of Indian people
             and their communities by depriving Indians of the full opportunity
22          to develop leadership skills crucial to the realization of self-
             government, and has denied to the Indian people an effective voice
23          in the planning and implementation of programs for the benefit of
             Indians which are responsive to the true needs of Indian
24          communities; and (2) *the Indian people will never surrender their*
             *desire to control their relationships* both among themselves and
25          *with non-Indian governments*, organizations, and persons.

26  25 U.S.C. § 5301(a)(1)-(2) (emphasis added).  Contrary to Congress' statutorily expressed intent,

27  Defendant's construction of section 5321(a)(1) would require the Secretary to enter into a self-

28  determination contract in every instance a tribe requests to plan, conduct, and administer

1   programs, without the tribe first deciding if it desires self-determination.  Such construction is

2   antithetical to the purpose of the ISDEAA, which is to ensure tribal input and give tribes control

3   over expressions of self-determination.

4         Congress's intent in ensuring tribes affirmatively resolve to enter into a self-

5   determination contract makes sense.  Self-determination is no light undertaking:

> 6   When an Indian tribe contracts, there is a transfer of the
> responsibility with the associated funding. The tribal contractor is
> 7   accountable for managing the day-to-day operations of the
> contracted Federal programs, functions, services, and activities.
> 8   The contracting tribe thereby accepts the responsibility and
> accountability to the beneficiaries under the contract with respect
> 9   to use of the funds and the satisfactory performance of the
> programs, functions, services and activities funded under the
> 10   contract.

11   25 C.F.R. § 900.3(b)(4); Seneca Nation of Indians v. U.S. Dep't of Health & Hum. Servs., 945 F.

12   Supp. 2d 135, 143 (D.D.C. 2013) ("[S]elf-determination contracts essentially allow Indian tribes

13   to step into the shoes of certain United States government agencies in providing certain services

14   to their members"); FGS Constructors, Inc., 64 F.3d at 1234 (acknowledging tribes are

15   "performing a federal function" when carrying out self-determination contracts).

16         The Court will not construe away Congress's express intent that tribes decide and control

17   self-determination.  The language in section 5321(a)(1) is plain: the Secretary is required to enter

18   into a self-determination contract upon request of a tribe by tribal resolution.  However, neither

19   the ISDEAA nor federal regulations formally define "tribal resolution."  Defendant argues that

20   the Court should look to standard dictionaries to define "resolution."  (Reply 4 (citing a

21   Webster's Dictionary definition of "resolution" as "the act or result of resolving something" or

22   "a formal statement of opinion or determination by an assembly, etc.").)  According to

23   Defendant, the tribe "resolved" to enter into the MOA through the sentence stating that "[t]he

24   Tribe, acting through the Chairperson, submitted a project proposal/letter to the IHS, dated June

25   2017, requesting assistance under Public Law 86-121 to serve the community in the construction

26   of wastewater disposal facilities…."  (2023 Whitten Decl., Ex. J at 6.)  Defendant clarified at the

27   hearing that because the Tribe "resolved" to request assistance and the chairperson of the Tribe

28   signed the MOA, "having been duly authorized to enter into [the] Agreement on behalf of the

1  Tribe," there is sufficient evidence of a request by tribal resolution to enter into a self-

2  determination contract.

3         At the hearing, the United States pointed to the Tribe's Constitution and Bylaws which

4  provides the Tribe's reasons for and procedures in issuing a "resolution."[9]  Pursuant to "Article

5  XII – Ordinances and Resolutions" of the Tribe's Constitution:

6               All final decisions of the council on matters of temporary interest
               (such as action on the tribal budget for a single year, or petitions to
7               Congress or the Secretary of the Interior) or relating especially to
               particular individuals or officials (such as adoptions of members,
8               instructions for colony employees, or rules of order for the council)
               shall be embodied in resolutions. Such resolutions shall be
9               recorded in a special book which shall be open to public
               inspection."

10

11  Tule River Tribal Const. and Bylaws, Art. XII, § 2.  The Tribe's Constitution details the voting

12  procedures for resolutions and mandates that every resolution "shall begin with the words: 'Be it

13  resolved by the council of the Tule River Tribe - - -' " and "shall contain a recital of the laws of

14  the United States and the provisions of this constitution under which authority for the said

15  ordinance or resolution is found."  Id. at Art. XII, §§ 4-5.

16        The Court is not persuaded that Congress intended to ascribe Defendant's procedurally

17  malleable definition of "resolution" to a tribe's request to enter a self-determination contract

18  under the ISDEAA.  Given the ISDEAA was intended to ensure tribal input and control over

19  self-determination, the Court finds it reasonable that Congress intended to defer to a tribe's

20  resolution procedures when requiring a request for self-determination be made by "tribal

21  resolution."  Defendant—an employee of the Tribe who otherwise does not contend he is a

22  representative of the Tribal Council—offers no evidence that a "tribal resolution" by the Tribe

23  can be reduced to a sentence within an MOA.  Even then, the Court does not find the sentence in

24  the MOA is a request by the Tribe to enter into a self-determination contract under the ISDEAA.

25

26  [9] The Court takes judicial notice of the "CONSTITUTION AND BYLAWS OF THE TULE RIVER INDIAN
    TRIBE OF CALIFORNIA," which is publicly available at the Library of Congress and the National Indian Law
27  Library.  Library of Congress, American Indian Constitutions and Legal Materials: "Constitution and Bylaws of the
    Tule River Indian Tribe, California. Approved January 15, 1936" available at
28  https://www.loc.gov/resource/llscd.36026283/?sp=1 (last visited Mar. 1, 2024); National Indian Law Library,
    available at https://narf.org/nill/constitutions/tulriverconst/constitution.html (last visited Mar. 1, 2024).

1    Notably, the record reflects that the Tribal Council voted on one tribal resolution in
2  connection with the Project.  In a letter dated July 21, 2017, the Tribe wrote to the CWISA
3  coordinator that "the Tribal Council has *voted*, *by resolution number 2017-0157*, to accept this
4  funding *and condition* set forth through the Interagency Agreement." (Vanegas Decl., Ex. 2 at 2
5  (emphasis added).)  While the formal resolution is not contained in the record, the Tribe's letter
6  confirms the Tribal Council voted to accept, by tribal resolution, the terms and conditions of the
7  IA.  Defendant offers no evidence that the Tribal Council requested in either resolution number
8  2017-0157 or through a different tribal resolution to enter into a self-determination contract to
9  assume responsibility of the SFC Program under the ISDEAA.

10    To the contrary, the letter confirms that by way of tribal resolution number 2017-0157,
11  the Tribe voted to accept the funding and condition set forth through the IA, which provided in
12  pertinent part that "[b]y accepting the funds via an interagency agreement, the Tribe and IHS *will*
13  *work cooperatively* to complete this project…The Tribe *will work with* IHS *throughout the entire*
14  *process*…." (Vanegas Decl., Ex 1 at 2 (emphasis added).)  The EPA informed the Tribe that if
15  the IA was not acceptable, it may choose to reject the award or submit a request for a direct
16  grant, which would enable the Tribe to enter into a self-determination contract.  (Id.; see Frueh
17  Decl., Ex. 1 at 4 ("Tribes that have assumed the responsibility to implement the IHS Sanitation
18  Facilities Construction Program under the [ISDEAA] can only receive CWISA funds through a
19  direct grant with the EPA").)  The Tribe accepted, by resolution number 2017-0157, IHS's
20  assistance under the Sanitation Facilities Act and agreed to work cooperatively throughout the
21  entire process to construct the Project using funds from the EPA.  By confirming they voted by
22  tribal resolution number 2017-0157 to accept the EPA's funding and IA condition, the Tribe
23  declined the offered alternative of assuming responsibility to implement the SFC Program under
24  a self-determination contract.  Defendant fails to meet his burden to otherwise show the Tribe
25  requested by tribal resolution to assume responsibility of the Project under a self-determination
26  contract.

27    The Court turns to the remaining pertinent subsections of 25 U.S.C. § 5321.  While
28  Defendant purports to apply a plain text analysis of section 5321, Defendant ignores section

5321(a)(2)(A)-(E), which plainly prescribes an additional prerequisite to form a self-determination contract:

> *If so authorized by an Indian tribe under paragraph (1) of this subsection*, a tribal organization *may submit a proposal for a self-determination contract*…to the Secretary for review….[T]he Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract unless [one of five exceptions applies]...

25 U.S.C. § 5321(a)(2)(A)-(E). Section 5321(a)(2) reiterates the requisite authorization by tribal resolution and requires that the requesting tribe take an additional affirmative step toward self-determination by submitting a proposal for a self-determination contract.

To aid tribes with this initial step, the Secretary has promulgated regulations "with the active participation and representation of Indian tribes, tribal organizations, and individual tribal members," to "codify uniform and consistent rules for contracts by the Department of Health and Human Services…in implementing title I of the [ISDEAA]…."  25 C.F.R. §§ 900.1, 900.2. The regulations detail mandatory self-determination contract proposal contents and procedures for tribes submitting initial proposals. See e.g., 25 C.F.R. § 900.8 (entitled "What must an initial contract proposal contain?").  Notably, a tribe's self-determination contract proposal must contain, inter alia, "[a] copy of the authorizing resolution from the Indian tribe(s) to be served." 25 C.F.R. § 900.8(d); see also 25 C.F.R. § 900.3(a)(8) ("Congress has declared that *all* self-determination contract proposals must be supported by the resolution of an Indian tribe(s)") (emphasis added).  Relevant here, the ISDEAA further "establishes a special process for review and negotiation of proposals for construction contracts which is different than that for other self-determination contract proposals." See 25 C.F.R. § 900.122 (entitled "What does an Indian tribe or tribal organization do if it wants to secure a construction contract?").

Defendant fails to proffer any evidence that the Tribe submitted a proposal for a self-determination contract supported by a tribal resolution.  The Court notes the MOA states the Tribe submitted a "project proposal/letter to the IHS, dated June 2017" wherein the Tribe, "request[ed] assistance [from the IHS] under [the Sanitation Facilities Act] to serve the community in the construction of wastewater disposal facilities…" (2023 Whitten Decl., Ex. J at

6), but no party—including Defendant, who bears the evidentiary burden—offers a June 2017 letter or proposal, or any other proposal, that is authorized by tribal resolution and requests a self-determination contract under the ISDEAA.[10]

Without evidence of a request by tribal resolution or a proposal for a self-determination contract, the Court is unpersuaded that the plain language and legislative history of the ISDEAA required the Secretary to enter into a self-determination contract with the Tribe for the Project. When challenged by a *tribe*, federal courts have previously been tasked to review the Secretary's denial of or failure to respond to a tribe's request and proposal to enter into a self-determination contract. See, e.g., Navajo Nation v. Dep't of Health & Hum. Servs., Sec'y, 325 F.3d 1133, 1134 (9th Cir. 2003) (en banc) (affirming the HHS Secretary's denial of a tribe's request to enter into a self-determination contract because the requested program was not a contractable program under the self-determination provisions of the ISDEAA); Hoopa Valley Indian Tribe, 415 F.3d at 987 (affirming the Bureau of Reclamation's refusal of a tribe's request to enter into self-determination contracts for proposed restoration projects because the restoration programs at issue were not eligible for mandatory contracts under the ISDEAA); Yurok Tribe v. Dep't of the Interior, 785 F.3d 1405, 1410 (Fed. Cir. 2015) (refusing to excuse the government's failure to timely respond to a tribe's letter entitled "Yurok Tribe *Title I Request* for the Yurok Department of Public Safety and the Yurok Tribal Court" which detailed a tribe's request for program inclusion and funding under Title I, included a tribal resolution, and was followed by an email entitled "Yurok Tribe—*Title I Request* and Council Tribal Resolution" because, despite the Tribe's failure to include all of the requirements for a proposal under 25 C.F.R. § 900.8, it was an unambiguous request by the tribe to enter into a self-determination contract under Title I of the ISDEAA) (emphasis added); Navajo Nation v. United States Dep't of Interior, 852 F.3d 1124, 1126 (D.C. Cir. 2017) (deeming a tribe's proposed funding agreement approved because the United States Department of Interior failed to act within 90 days after receipt).

---

[10] The Court notes IHS's public Indian Health Manual chapter regarding MOA procedures ("IHS-MOA") also requires that project proposals or letter requests for IHS sanitation facilities be submitted in writing.  IHS-MOA § 5-2.4(D)(2).  Accordingly, a written project proposal/letter is also required to form a MOA to construct a project that is not subject to the ISDEAA.

1    Here, however, the Tribe is not presenting a denial of a self-determination contract or

2  other pre-award dispute.  Rather, Defendant—a tribal employee who proffers no evidence that

3  the Tribe requested by tribal resolution to enter a self-determination contract or submitted a

4  proposal to IHS—requests that the Court construe the fully performed MOA into a self-

5  determination contract strictly to attach FTCA coverage.  As noted, Defendant cites no

6  authority—and the Court finds none—that authorizes a court to retroactively determine that a

7  fully performed MOA should have been a self-determination contract under the ISDEAA and

8  then re-label it as such to attach FTCA coverage.[11]

9    Even if the Court disregarded the express self-determination contract formation

10 requirements provided in section 5321, the fully performed MOA cannot be reverted into a self-

11 determination contract because the MOA does not contain the statutorily mandated terms of a

12 self-determination contract.  25 U.S.C. § 5329(a) ("Each self-determination contract entered into

13 under this chapter shall…contain, or incorporate by reference, the provisions of the model

14 agreement described in subsection (c) of this section (with modifications where indicated and the

15 blanks appropriately filled in)….")  In section 5321(c), Congress included a detailed fill-in-the-

16 blank model self-determination contract which begins with a provision clearly stating the

17 agreement is entered into pursuant to the ISDEAA and concludes with a statement that the tribe's

18 resolution authorizing the contract is attached.  The fully performed MOA in the instant action

19 does not follow the statutorily provided model agreement.  (Compare 2023 Whitten Decl., Ex. J

20 with 25 U.S.C. § 5329(c).)[12]  The MOA never mentions ISDEAA or "self-determination."  As

21 the United States points out, the MOA also includes additional terms that are incompatible with a

22 self-determination contract.  Illustratively, the MOA includes an express provision that "[t]he

23 Tribe is responsible for all tort claims…resulting from its activities on this project." (2023

24 Whitten Decl., Ex. J at 10); see 25 U.S.C. § 5321(c) (if it was intended to be a self-determination

25

26  [11] See Newtok Vill. v. Patrick, 21 F.4th 608, 618 (9th Cir. 2021) (confirming the ISDEAA confers jurisdiction on
federal district courts to hear disputes by tribes against the United States regarding self-determination contracts)
27  (emphasis added).

28  [12] The Court also notes that the Tribe's current non-SFC Program related self-determination contract entered into
under the ISDEAA between IHS and the Tribe follows the model agreement.  (See Simmons Decl., Ex. 1.)

1  contract, the ISDEAA provides that "the Secretary shall be responsible for obtaining or
2  providing liability insurance" under the FTCA.

3          Defendant underscores that to the extent there is any ambiguity whether the MOA is a
4  self-determination contract, the ISDEAA instructs that each provision of the ISDEAA "shall be
5  liberally construed for the benefit of the Indian Tribe participating in self-determination, and any
6  ambiguity shall be resolved in favor of the Indian Tribe." (Mot. 14 (citing 25 U.S.C. §
7  5321(g)).) This provision would apply if the Court found the Tribe participated in self-
8  determination. Even then, the Court cannot locate any ambiguity within section 5321. The plain
9  text and supporting regulations establish that if a tribe elects to request a self-determination
10 contract by tribal resolution, and so submits a proposal that conforms with 25 C.F.R. Part 900 for
11 a self-determination contract, *then* the Secretary is required to enter into a self-determination
12 contract unless one of five exceptions applies. See 25 U.S.C. § 5321(a)(2)(A)-(E). The
13 mandatory nature of a self-determination contract is therefore predicated on a tribe's
14 discretionary decision, reached through a tribal resolution, to request and propose a self-
15 determination contract to plan, conduct, and administer programs or portions thereof, including
16 construction programs provided under the Sanitation Facilities Act. See Los Coyotes Band of
17 Cahuilla & Cupeno Indians v. Jewell, 729 F.3d 1025, 1033 (9th Cir. 2013) ("*If certain conditions
18 are met*, the Secretary of the Interior must approve the contract request") (emphasis added). The
19 provisions "upon the request of any Indian tribe by tribal resolution" and "[i]f so authorized by
20 an Indian tribe…a tribal organization may submit a proposal for a self-determination contract…"
21 are not susceptible to multiple interpretations. The Court declines to create ambiguity within
22 section 5321 where it does not exist.

23         Because the ISDEAA allows the tribe to make the discretionary decision whether it
24 desires to bear the burden of "step[ping] into the shoes of certain United States government
25 agencies in providing certain services to their members," the Court finds section 5321 does not
26 blanketly require that the Secretary enter a self-determination contract in every instance a tribe
27 requests to plan, conduct, or administer certain federal programs. Seneca Nation of Indians, 945
28 F. Supp. 2d at 143; see 25 C.F.R. § 900.4(c) ("Nothing in these regulations shall be construed

1  as…[m]andating an Indian tribe to apply for a contract(s) or grant(s) as described in the

2  [ISDEAA]…"); 25 U.S.C. § 5321(a)(2) ("a tribal organization *may* submit a proposal for a self-

3  determination contract") (emphasis added); Jewell, 729 F.3d at 1033 ([The ISDEAA] created a

4  system by which tribes *could* take over the administration of programs...a tribe…*may* submit a

5  contract proposal to the BIA to take over the program and operate it as a contractor and receive

6  the money that the BIA would have otherwise spent on the program) (emphasis added); IHM-

7  MOA § 5-2.9B (explaining that "[a]n *alternative* to [the SFC Program] is the P.L. 93-638 Indian

8  Self-Determination contract," and a self-determination construction contract "is another method

9  available to provide sanitation facilities") (emphasis added).

10      Instead, if a tribe elects not to assume responsibility of the SFC Program under the

11  ISDEAA, IHS is "authorized" under the Sanitation Facilities Act to "make such arrangements

12  and agreements…with the Indians to be served by such sanitation facilities…regarding

13  contributions toward the construction, improvement, extension, and provision thereof, and

14  responsibilities for the maintenance thereof…."  42 U.S.C. § 2004(a)(3).  Here, the MOA was

15  the instrument through which the Tribe participated in the SFC Program under the Sanitation

16  Facilities Act.  The United States proffers evidence that the IHS executes multiple MOAs

17  annually under the Sanitation Facilities Act for tribes that similarly choose not to request self-

18  determination contracts.  (Rash Decl. ¶ 7.)  By electing not to assume responsibility of the SFC

19  Program under the ISDEAA and instead requesting the IHS to perform the work, tribes benefit

20  by avoiding substantial costs.  (Id.)

21      Rather than a transfer of authority from the IHS to the Tribe whereby the Tribe assumed

22  responsibility for the Project as required by a self-determination contract, the MOA created a

23  "cooperative relationship" between the IHS and the Tribe to complete the Project under the

24  Sanitation Facilities Act.  (Vanegas Decl., Ex 1 at 2); see also IHM-MOA § 5-2.2A.  The IHS

25  provided "engineering services and technical assistance with contract administration,

26  construction inspection, supply and materials purchase, construction staking…[t]he instructions

27  as to the proper utilization, maintenance, operation, and protection of the facilities…," "prepare a

28  work plan, including a project schedule."  (2023 Whitten Decl., Ex. J at 11.)  In turn, the Tribe

1  provided construction labor through a Tribal Force Account.  (See McDarment Decl., Ex. H.)
2  The Project was funded through a CWISA contribution, not the IHS.  (2023 Whitten Decl., Ex. J
3  at 14.)  The IHS and Tribe signed the MOA which expressly states that the Tribe was responsible
4  for all tort claims resulting from its activities on the Project.  (2023 Whitten Decl., Ex. J at 10.)
5  IHS and the Tribe had intent and authority to enter into the MOA independent from the ISDEAA
6  to cooperatively construct the Project.  The Court will not disturb the fully performed MOA
7  completed under the Sanitation Facilities Act.

8      The ISDEAA did not mandate that the Tribe enter into a self-determination contract with
9  the Secretary to construct the Project.  In turn, the Court finds the Secretary was not required to
10  enter into a self-determination contract on behalf of the Tribe without a request by tribal
11  resolution or a proposal to do so.  Defendant fails to prove by a preponderance of the evidence
12  that the Tribe requested by tribal resolution to enter into a self-determination contract or
13  submitted a proposal for a self-determination contract for the Project.  Defendant therefore fails
14  to establish he was a covered employee under a self-determination contract as defined under the
15  ISDEAA.  Accordingly, the Court recommends denying Defendant's motion to certify he is a
16  covered federal employee subject to FTCA coverage under the ISDEAA.[13]  Further, the Court
17  recommends this action be remanded to Tulare County Superior Court pursuant to 28 §
18  2679(d)(3).

19                                      **V.**

20                      **RECOMMENDATION AND ORDER**

21      For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

22      1.    Defendant's motion to certify employment, substitute the United States as a party
23            defendant, and dismiss Defendant be DENIED; and

24      2.    The action be REMANDED to Tulare County Superior Court pursuant to 28 §
25            2679(d)(3).

---

26  [13] Because Defendant fails to show he was employed under a self-determination contract, the Court does not apply
27  the two-step Shirk test, which would require that Defendant prove he was not only acting in course and scope of his
    employment with the Tribe at the time of the subject motor vehicle collision, but that he was specifically carrying
    out the Tribe's self-determination contract at the time of the collision.  See Shirk, 773 F.3d 999; Wilson, 906 F.3d
28  773.

1    These findings and recommendations are submitted to the district judge assigned to this

2  action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within **fourteen**

3  **(14) days** of service of these recommendations, the parties may file written objections to the

4  findings and recommendations with the Court.   Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."   The District Judge will

6  review the Magistrate Judge's findings and recommendations pursuant to 28 U.S.C. §

7  636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may

8  result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014)

9  (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

10

11  IT IS SO ORDERED.

12  Dated:   **March 8, 2024**

UNITED STATES MAGISTRATE JUDGE